# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | |
|---|---|
| FE WEAR, widow of RICKY WEAR, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No.: 3:06-cv-244 |
| ) | (VARLAN/SHIRLEY) |
| TRANSAMERICA LIFE INSURANCE ) | |
| COMPANY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

This is an action to recover $100,000 in life insurance proceeds under a group term life insurance policy offered by defendant Transamerica Life Insurance Company[1] (Transamerica) to employees at Carlex Glass Company (Carlex) [Doc. 1-2, pp.4-5]. Plaintiff Fe Wear, a Carlex employee, originally filed this action on May 25, 2006, in the Circuit Court for Monroe County, Tennessee, seeking those policy limits after her husband, Ricky Wear, died from a shotgun blast to the chest during an altercation on September 24, 2004 [*see id.,* pp.4-7]. Plaintiff also seeks $25,000 as a bad faith penalty pursuant to Tenn. Code Ann. § 56-7-105 [*id.*, p.5].

On June 27, 2006, Transamerica timely removed the action to this Court, *see* 28 U.S.C. § 1446(b), alleging federal question jurisdiction, *see* 28 U.S.C. § 1331, based on the

---

[1]At the time of some of the events at issue, defendant employed the nomenclature "Transamerica Assurance Company"; however, that entity was merged into Transamerica Life Insurance Company on October 1, 2004 [*see* Doc. 1-2, p.10].

Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, *et seq.*, as well as jurisdiction based on diversity of citizenship of the parties[2] and the amount in controversy exceeding $75,000 [Doc. 1, p.2]. *See* 28 U.S.C. § 1332(a)(1). On July 17, 2006, Transamerica filed its answer, denying any and all liability to plaintiff [Doc. 3]. This matter is presently before the Court on the following motions by Transamerica:

    1.    Motion for summary judgment [Doc. 14] based on the fact that: (a) Transamerica declined coverage because the spouse of a non-participating employee was not entitled to coverage; and (b) plaintiff made certain misrepresentations on the application about her husband's medical record which increased Transamerica's risk of loss; and

    2.    Motion to dismiss [Doc. 18] based on plaintiff's failure to prosecute and, in particular, to comply with certain facets of the Scheduling Order [Doc. 8] filed on December 19, 2006.

With respect to the motion for summary judgment, the issues raised have now been fully briefed by the parties [*see* Docs. 15, 16, 17, 20, 21, 22, and 23] so that this motion is ripe for adjudication.[3] For the reasons that follow, Transamerica's motion for summary judgment will be granted and its motion to dismiss will be denied as moot.

---

[2]Plaintiff is a citizen of the State of Tennessee, and defendant is "a foreign corporation located in Cedar Rapids, Iowa, doing business in the State of Tennessee." [*See* Doc. 1, p.3].

[3]The Court notes for the record that the parties filed a second round of briefs [*see* Docs. 20-23] pursuant to a memorandum and order [Doc. 19] filed on August 7, 2007, identifying two additional issues - one legal and one factual - which needed further development before adjudication of the pending motion for summary judgment.

# I. *Factual Background*

The facts of this case will, of course, be viewed in the light most favorable to plaintiff. Pursuant to its collective bargaining agreement with the United Auto Workers, Carlex is required to offer "employee-paid voluntary life insurance" to its employees [Doc. 16-3, p.3]. Voluntary life insurance meetings were therefore conducted at Carlex on an annual basis [*id.*]. Carlex would send a notice through its supervisors when those voluntary life insurance meetings would occur [*id.*]. All employees who had been hired since the previous meetings were invited to attend those informational meetings and would receive a memo to that end [*id.*]. Employees who had previously purchased insurance were also invited to meet with a representative if they had questions or concerns [*id.*].

A short meeting would be held to inform the employees that voluntary life insurance is available for employees and their spouses, children, and other dependents [*id.*]. If employees were interested in meeting with the representative from the insurance company, they would complete a form requesting a meeting [*id.*]. The representative would then meet with all employees who made that request [*id.*].

When all meetings and appointments were completed, the representative would leave payroll deduction forms, if applicable [*id.*]. The insurance policies and all communications regarding those policies were sent directly to the employees' homes [*id.*]. If employees elected to stop or cancel their insurance, they could complete a form at Carlex and the payroll deduction would be stopped [*id.*]. If the employee left Carlex, the payroll deduction would

automatically stop and the employee would be responsible for paying his or her premium [*id.*].

Against this background, plaintiff testifies that on April 1, 2003, "a friend told me about this insurance program where we could insure our husbands." [Doc. 16-2, p.4].[4] Plaintiff testifies further that she then met "the agent who asked me what I wanted to buy." [*Id.*]. Plaintiff told him that she "just wanted insurance on [her] husband because [she] already ha[d] a policy through Carlex." [*Id.*].

It is undisputed that plaintiff completed an application for life insurance with Transamerica on April 1, 2003 [*see* Doc. 14-2, pp.4-5]. Plaintiff's application sought to insure the life of her husband, making her the sole beneficiary of the $100,000 policy [*id.*]. Plaintiff did not seek coverage for herself [*id.*, p.4].

The insurance application at issue, like virtually every other life insurance application, asks several questions concerning the proposed insured's background and medical history [*see id.*, pp.4-5]. Of particular significance to the issues raised in Transamerica's motion, Question 28(c) asks whether the proposed insured has ever been treated for, or currently had, "emotional or mental disorders, any disease or abnormality of the brain, [or] drug addiction or alcoholism[.]" [*Id.,* p.5]. Question 30 asks whether the proposed insured has ever "received any medical or surgical advice for any ailment, injury or sickness other than those

---

[4]The Court notes for the record that Transamerica vigorously objects to any consideration of plaintiff's affidavit as it "constitute[s] inadmissible hearsay which should not be considered by this Court." [Doc. 17, p.2]. The Court need not resolve this evidentiary issue, however, because even if all of plaintiff's statements in her affidavit are deemed admissible, Transamerica still prevails on its motion for reasons to be discussed shortly.

listed above[.]" [*Id.*]. The form also includes an area for providing additional information about any medical conditions which may be responsive to the individual questions set forth in the form [*id.*].

When plaintiff completed the form on April 1, she answered "No" to Questions 28(c) and 30 [*id.*]. Plaintiff did, however, provide information about her husband's hypertension and listed two medications, Lisinopril and Hydrochlorothiazide, both of which are used to treat hypertension [*id.*].[5] No other medical conditions nor medications were listed [*id.*]. It is undisputed that plaintiff signed the insurance application. It must be noted that, just above plaintiff's signature, the insurance application form states, "I/WE REPRESENT that all statements and answers made in this Application ... are true and complete to the best of my/own knowledge and belief." [*Id.*]. Furthermore, just above that statement, the following warning appears: "CERTIFICATION STATEMENT – EACH PROPOSED INSURED MUST READ THE ENTIRE FORM CAREFULLY BEFORE SIGNING." [*Id.*]. Finally, it is undisputed that, after completion of the application, Transamerica issued a policy to plaintiff insuring the life of her husband [*see* Doc. 14-3, pp.5-27]. The effective date of the policy was June 1, 2003 [*see id.*, p.7].

Under the terms of the Group Master Policy, the spouse of a non-participating employee is not entitled to coverage [*see* Doc. 14-3, p.21]. Accordingly, on May 15, 2003, before the effective date, Transamerica's New Business Department cancelled this policy

---

[5]*Dorland's Illustrated Medical Dictionary*, 783, 951 (28th ed. 1994).

because plaintiff had sought no insurance for herself [*see* Doc. 14-3, pp.2,4]. On August 12, 2003, Transamerica returned the premium payments that had been made by plaintiff at that time, totaling $23.58, to Carlex [*id.* at p.28]. Transamerica further informed Carlex that the policy had been declined and requested that Carlex credit plaintiff's paycheck with the returned premiums [*id.*]. It must be emphasized at this juncture that Carlex, pursuant to the terms of the insurance policy, serves as plaintiff's agent – not Transamerica's agent [*see* Doc. 14-3, p.11].[6]

As previously noted, plaintiff's husband, Ricky Wear, was killed in an altercation on September 24, 2004, as the result of a shotgun blast to the chest. Because Mr. Wear passed away within the two-year contestability period of the life insurance policy, Transamerica opened a standard investigation into plaintiff's claim for benefits pursuant to its normal practice [*see* Doc. 14-3, pp.2, 11].[7] Transamerica's investigation indicated that Mr. Wear suffered from serious medical problems that were not set forth on the life insurance application [Doc. 14-2, p.2, ¶¶7-8]. More specifically, Sally Davis, a senior underwriter for

---

[6]That provision of the Group Term Life Insurance Certificate states as follows:

> **EMPLOYER AS YOUR AGENT:** For all purposes related to this insurance, your Employer serves as your agent and not as our agent.

[7]That provision of the Group Term Life Insurance Certificate states as follows:

> **RIGHT TO CONTEST:** We will not contest this insurance after it has been in force during the lifetime of each insured for two years from the date it starts, except for non-payment of premiums. If any death benefit is increased, our two year right to contest starts anew, but will apply only to the amount of the increase.

Transamerica, testifies that her review of Mr. Wear's medical records dated December 19, 2002, less than four months before plaintiff's completion of Mr. Wear's application for insurance, indicates that "Mr. Wear had diagnoses of 'major depressive disorder, recurrent, severe, and alcohol abuse, in early remission, and personality disorder, not otherwise specified with features of social anxiety as well as impulse control problems.'" [*See* Doc. 14-2, p.2, ¶9].[8] These same medical records, according to Ms. Davis's review, also show that Mr. Wear was taking "Paroxetine, an anti-depressant, and Quetiapine Fumarate, a psychiatric medication." [*Id.*, p.2, ¶10].[9] Consequently, Transamerica's underwriters determined that these medical conditions, which were not disclosed on the insurance application, "raised the risk of loss for Transamerica Life Insurance Company with regard to Mr. Wear's life insurance policy." [*Id.*, p.3, ¶14].

The record in this case further reflects that a subsequent audit of plaintiff's claim by Transamerica indicated that Carlex had erroneously continued to send premiums on behalf of plaintiff to Transamerica for this policy even though the policy had previously been declined [*see* Doc. 14-3, p.31]. As a result, on December 2, 2004, Transamerica sent to Carlex a check totaling $290.82, which represented premiums forwarded by Carlex to Transamerica for Ms. Wear's policy [*see id.*]. Although Carlex did forward that check to plaintiff [*see* Doc. 16, p.11], plaintiff never cashed this check [*see id.*, p.12].

---

[8]The Court's review of the precise language of those medical records indicates the same interpretation.

[9]Those medications are clearly set forth on Mr. Wear's medical records [*see id.*, p.9].

On February 17, 2005, plaintiff, through her attorney of record, made demand on Transamerica for payment of the policy limits of $100,000 [*id.*]. When Transamerica refused to pay for the same reasons set forth in its pending motion, plaintiff filed this action on May 25, 2006, in the Circuit Court for Monroe County, Tennessee [*see* Doc. 1-2, pp.4-7].

In response to Transamerica's motion for summary judgment, plaintiff primarily takes the position that she did not understand the questions on the insurance application form because of her "marginal knowledge of English and [her] limited education" [Doc. 16, p.3] and that the involvement of a third party in the completion of the insurance application adversely affects the merits of Transamerica's defense of this litigation. In further support of her position, plaintiff has filed her affidavit in which she testifies that she was born in the Phillippines; that she graduated from the St. Anthony Academy in the Phillippines, "which was equivalent to a U.S. high school"; that she came to the United States in December 1989 as the fiancé of a member of the United States Marine Corps; that she was married in 1990 and was divorced in 1991; and that she met Ricky Wear shortly thereafter and was married to him in 1992 [*see* Doc. 16-2, p.3]. With respect to the facts and circumstances surrounding this case, plaintiff testifies verbatim as follows:

> 5.   I was working at Carlex Glass Company and on April 1, 2003, a friend told me about this insurance program where we could insure our husbands. I met the agent who asked me what I wanted to buy. I told him I just wanted insurance on my husband because I already have a policy through Carlex.
>
> 6.   The agent read me questions from the form and I answered them and he filled out the form.

7.    I did not say Ricky was treated for alcoholism because I do not know what is meant by the word "treatment." I never thought he was treated for alcoholism because he said he was going to rehab after his second DUI offense so he did not have to go to jail for a full 45 days.

8.    I am now studying for my G.E.D. through the Monroe County Board of Education because I want to take courses in Cosmetology, but I could not pass the entrance examination for the course. I need the training so that I can get a better job.

[*Id.* at p.4].

## II. *Diversity Case or ERISA Case?*

As this Court previously observed in the memorandum and order [Doc. 19] filed on August 7, 2007, the "initial dilemma ... is whether the facts of this case are governed by Tennessee law or by federal ERISA law." [*Id., p.3*]. In view of the supplemental briefing by the parties, this Court is now of the definite and firm opinion, for the reasons to follow, that the jurisdiction of this case is predicated purely on diversity jurisdiction and that ERISA plays no role in the Court's analysis of the pending legal issues.

In reaching this conclusion, the Court is guided by the following language in 29 C.F.R. § 2510.3-2(j) as to certain programs which are excluded from the scope of ERISA:

(j)    *Certain group or group-type insurance programs.* For purposes of title I of [ERISA] ... , the terms "employee welfare benefit plan" and "welfare plan" shall not include a group or group-type insurance program offered by an insurer to employees or members of an employee organization, under which

(1)   No contributions are made by an employer or employee organization;

(2)   Participation [in] the program is completely voluntary for employees or members;

(3)   The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and

(4)   The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 2510.3-2(j) (2007).

Here, the proof is undisputed that the first requirement of this exclusionary provision is satisfied because Carlex made no contribution to this insurance program on behalf of plaintiff or any other employee.  The second requirement is also met because it is undisputed that participation by plaintiff and others in this life insurance program was completely voluntary.  Likewise, the third requirement of this exclusionary provision is fulfilled because Carlex's sole function in this insurance program was to publicize the program to its employees and to collect premiums through payroll deductions.  The proof further indicates that Carlex did not endorse this program but offered it pursuant to its collective bargaining agreement with its employees.  Finally, the fourth requirement is satisfied because there is no proof in this record that Carlex received any consideration in the form of cash in

connection with this life insurance program offered by Transamerica. Consequently, the Court finds that this particular group term life insurance policy is specifically excluded from the scope of ERISA. This Court will therefore analyze this case as it would any other diversity case in which a motion for summary judgment is pending.[10]

### III. *Summary Judgment Standard*

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper if "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 601 (6th Cir. 1988) (quoting Fed. R. Civ. P. 56(c)). The burden on the moving party may be discharged if the moving party demonstrates that the non-moving party has failed to establish an essential element of his or her case for which he or she bears the ultimate burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Although the moving party bears the initial burden, it need not support its motion with affidavits or other materials "negating" the opponent's claim. Id. at 323 (emphasis in original); *Adock v. Firestone Fire & Rubber Co.*, 822 F.2d 623, 626 (6th Cir. 1987). Rather,

---

[10]The Court notes for the record that even if Transamerica's motion were considered in light of applicable ERISA law, Transamerica would still prevail as this Court would apply federal common law rules of contract interpretation in making that determination. *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 556 (6th Cir. 1998) (citation omitted). Furthermore, in developing federal common law rules of contract interpretation, this Court would take direction from both state law and general contract principles. *Id.* (citation omitted). Thus, this Court would still be guided by Tennessee cases to some extent under those circumstances, thereby reaching the same conclusion.

"the burden on the moving party may be discharged by `showing' - that is, pointing out to the district court - that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.*, 477 U.S. at 325.

Once the moving party carries its initial burden of showing that no genuine issues of material fact are in dispute, the burden shifts to the non-moving party to come forward with specific facts to show that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find for it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.* However, the non-moving party must do more than show that there is "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. The non-moving party must present significant probative evidence in support of its complaint to defeat the motion for summary judgment. *Liberty Lobby*, 477 U.S. at 249-50.

Upon review of all of the evidence relevant to the motion for summary judgment, a court should, after viewing the evidence in the light most favorable to the non-moving party, determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *Boyd v. Ford Motor Co.*, 948 F.2d 283, 285 (6th Cir. 1991), *cert. denied*, 503 U.S. 939 (1992). Thus, "[t]he inquiry performed is the threshold inquiry of determining whether there

is the need for trial - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Liberty Lobby*, 477 U.S. at 250; *Stein v. National City Bank*, 942 F.2d 1062, 1064 (6th Cir. 1991).


## IV. *Choice of Law*

Because jurisdiction in this case is predicated purely on diversity of citizenship, this Court must apply state law. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). Under the *Erie* doctrine, a federal court sitting in diversity must apply the choice of law rules of the state in which it sits. *See Klaxon Co. v. Stentor Elec. Mfg.*, 313 U.S. 487, 496 (1941); *Tele-Save Merchandising Co. v. Consumers Distributing Co.*, 814 F.2d 1120, 1122 (6th Cir. 1987). Under Tennessee law, the validity of a contract and substantive rights of the parties thereto are governed by the laws of the state contemplated by the parties; absent an enforceable choice of law clause, the parties are presumed to have intended to contract pursuant to the laws of the state in which the contract was entered into. *Mackey v. Judy's Foods, Inc.*, 867 F.2d 325, 328 (6th Cir. 1989) (citing *Boatland, Inc. v. Brunswick Corp.*, 558 F.2d 818, 821 (6th Cir. 1977)). Here, the insurance contract at issue does not contain any enforceable choice of law provision. Consequently, with respect to insurance contracts without enforceable choice of law clauses, Tennessee courts apply the substantive law of the state where the policy was issued and delivered. *See Standard Fire Ins. Co. v. Chester-O'Donley*

*& Assoc., Inc.*, 972 S.W.2d 1, 5 (Tenn. Ct. App. 1998) (citation omitted). *See also* Tenn. Code Ann. § 56-7-102.

In that regard, the only proof in this record indicates that the insurance policy at issue was delivered to plaintiff, a Tennessee resident, in the State of Tennessee. Again, because the insurance policy at issue contains no choice of law clause, Tennessee law compels the conclusion that the substantive law of Tennessee should control this Court's interpretation and analysis of the facts and circumstances surrounding plaintiff's completion of the insurance application at issue.

## V. *Law and Analysis*

### A. *Risk of Loss Issue*

Tenn. Code Ann. § 56-7-103 authorizes an insurance company to deny a claim for benefits in two circumstances – if the insured made intentional misrepresentations on the application for insurance or if the insured made misrepresentations that increased the insurer's risk of loss. *Smith v. Tenn. Farmers Life Reassurance Co.*, 210 S.W.3d 584, 589 (Tenn. Ct. App. 2006). In this case, Transamerica relies on the second prong of this statute, arguing that plaintiff's misrepresentations regarding her husband's medical history and his medications increased its risk of loss. Determining whether a particular misrepresentation increases an insurance company's risk of loss is a question of law for the court. *Broyles v. Ford Life Ins. Co.*, 594 S.W.2d 691, 693 (Tenn. 1980).

It is well settled in Tennessee that a misrepresentation in an application for insurance increases the insurance company's risk of loss if it naturally and reasonably influences the judgment of the insurer in making the contract. *Smith v. Tenn. Farmers Life Reassurance Co.*, 210 S.W.3d at 590 (citations omitted). It is equally well settled that the courts may use the questions an insurance company asks on its application to determine the types of conditions or circumstances that the insurance company considers relevant to its risk of loss. *Id.* (citing *Johnson v. State Farm Life Ins. Co.*, 633 S.W.2d 484, 487 (Tenn. Ct. App. 1981)). Additionally, in Tennessee, "the courts frequently rely on the testimony of insurance company representatives to establish how truthful answers by the proposed insured would have affected the amount of the premium or the company's decision to issue the policy." *Id.* (citations omitted). Moreover, "[a] finding that the insurer would not have issued the policy had the truth been disclosed is unnecessary; a showing that the insurer was denied information that it, in good faith, sought and deemed necessary to an honest appraisal of insurability is sufficient to establish the grounds for an increased risk of loss." *Id.* (citations omitted).

The facts of the *Smith* case are particularly instructive for purposes of analyzing the present case. In *Smith*, plaintiff was a widow seeking benefits under a life insurance policy which covered her husband. *Id.* at 587. During the application process, the decedent underwent a physical examination. *Id.* During this examination, the decedent indicated that he had never been arrested or treated for alcohol problems and that he never had his driver's license revoked or suspended. *Id.* When the decedent later died from a heart attack within

the contestability period of the policy, the life insurance company conducted its standard investigation. *Id.* The investigation "revealed that Mr. Smith had not been truthful in his answers during the medical examination." *Id.* Consequently, the insurance company declined to pay any benefits to the plaintiff due to the misrepresentations on the application for life insurance. *Id.* at 587-88.

Applying Tennessee law to the facts of the *Smith* case, the Tennessee Court of Appeals emphasized that the proper inquiry in these cases is "simply whether the misrepresentation increased the insurance company's risk of loss." *Id.* at 590-91. In *Smith*, the facts demonstrated that the decedent had a DUI conviction, chronic obstructive pulmonary disease, and peptic ulcer disease, none of which was listed on the insurance application. *Id.* at 587-88. The underwriter for the insurance company testified that if this information had been provided, it would have resulted in either a higher premium or would have caused the insurance company to decline to insure the decedent at all. *Id.* at 591. The Court also observed that the underwriter "alluded to the fact that persons with DUI convictions have a higher risk of death, especially deaths caused by automobile accidents." *Id.* The Court also viewed the underwriter's conclusion as "a matter of common sense." *Id.* (quoting *Vermont Mut. Ins. Co. v. Chiu*, 21 S.W.3d 232, 237 (Tenn. Ct. App. 2000)). Based on this evidence, the Court found that the insurance company was denied information which would have influenced its decision to issue the policy and, as a result, the company "was well within its statutory rights to decline to pay benefits under the policy." *Id.*

Similarly, in the instant case, it can hardly be disputed that Transamerica was denied important, if not critical, information about Mr. Wear's medical condition which raised Transamerica's risk of loss, thereby statutorily entitling Transamerica to deny payment under the policy at issue. In that regard, Ms. Davis's affidavit is crucial. Again, Ms. Davis, a senior underwriter with Transamerica, testifies that because Mr. Wear passed away during the contestability period of the life insurance policy, Transamerica conducted a standard investigation into the claim for benefits made by plaintiff [*see* Doc. 14-2, p.2]. That investigation revealed that there was significant medical information concerning Mr. Wear which was not provided to Transamerica on its application form [*id.*].

Specifically, in Question 28(c), the Transamerica application form asked whether the insured had ever been treated for, or currently had, "emotional or mental disorders, any disease or abnormality of the brain, [or] drug addiction or alcoholism." [*Id.*, p.5]. The plaintiff answered "No." [*Id.*]. Furthermore, Question 30 asked whether the insured had "received any medical or surgical advice for any illness, injury or sickness other than those listed above." [*Id.*]. Again, plaintiff's answer to that question was "No." [*Id.*]. Finally, space was provided on the form to provide additional information concerning the medical conditions discussed in the preceding questions [*id.*]. Plaintiff listed only two medications, Lisinopril and Hydrochlorothiazide, both of which were prescribed for hypertension [*id.*]. No other medications or conditions were listed on the application [*id.*].

In support of its position, Transamerica has produced medical records which indicate that Mr. Wear's true medical condition was in stark contrast to his condition set forth in the application at issue. Although Transamerica represents that there are many other medical records to reflect this, Transamerica relies solely on the December 19, 2002, medical records from the Veterans Affairs (VA) Hospital to support its position [*see id.*, pp.6-11]. According to those medical records, only four months old when the application for life insurance was completed, Mr. Wear had been given a 10% disability rating by the VA due to hypertension and hemorrhoids [*id.,* p.6]. More importantly, the record reflects that Mr. Wear has had "continuous and repeated problems with anxiety, depression and anger outbursts." [*Id.,* p.7]. Mr. Wear had also received treatment from a psychiatrist in Maryville, Tennessee, and had been observed at the Psychiatry Section of the VA Outpatient Clinic since 1998 [*id.*]. In addition, these records indicate that Mr. Wear had two prior DUIs and that he had been drinking one to two six-packs weekly "for years." [*Id.*].

Even more significantly, at the time of these particular medical records, Mr. Wear had "current psychiatric diagnoses of major depressive disorder, recurrent, severe and alcohol abuse, in early remission, and personality disorder, not otherwise specified with features of social anxiety as well as impulse control problems." [*Id.,* p.8]. Mr. Wear was being prescribed psychiatric medications through the VA Clinic, including Paroxetine, an anti-depressant, and Quetiapine Fumarate, a psychiatric medication sometimes used for schizophrenic conditions. Other diagnoses included "hypertension, peptic ulcer disease and arthritic disease in both feet." [*Id.,* p.9].

18

In view of the above, it is Transamerica's unwavering position that, in light of the multitude of serious diagnoses, the correct answers to Questions 28(c) and 30 on the insurance application form should have been "Yes." [Doc. 14-2, p.2, ¶ 12]. It is Transamerica's further position that Mr. Wear's psychiatric medication should have been listed on the form [*id.*, ¶ 13]. According to Ms. Davis, if this information had been known to Transamerica, the insurance policy at issue would not have been issued as requested by plaintiff [*see id.*, p.3, ¶ 15]. Moreover, according to Ms. Davis, this omitted medical information clearly raised Transamerica's risk of loss with regard to the policy insuring Mr. Wear's life [*id.*, ¶ 14].

This Court agrees with Transamerica's position that it was denied information which it deemed necessary to an honest appraisal of the insurability of Mr. Wear. Furthermore, the Court agrees with Transamerica that the information omitted by plaintiff concerned serious medical diagnoses which raised Transamerica's risk of loss with regard to this policy. Consequently, the Court concludes that Transamerica was well within its rights to rely on Tenn. Code Ann. § 56-7-103 and case law, such as the *Smith* case discussed above, to decline to pay benefits under the policy to plaintiff. Transamerica is thus entitled to judgment as a matter of law, and its motion for summary judgment must be granted for this reason alone.

In reaching this conclusion, the Court is not persuaded by plaintiff's argument that she did not understand the insurance application. Again, plaintiff, through counsel, represents that she "has at best a marginal knowledge of English and a limited education." [Doc. 16, p.3]. Plaintiff's affidavit, however, makes no such statement in support of that

representation. In fact, plaintiff testifies in her affidavit that she "graduated from the Academy, which was equivalent to a U.S. high school[,]" [*see* Doc. 16-2, p.3], indicating that she has more than a "limited education" as asserted by her attorney. Even more importantly, plaintiff does not testify in her affidavit that she did not understand the questions on the insurance application. To the contrary, plaintiff testifies that "[t]he agent read me questions from the form and I answered them ... ." [*Id.*, p.4].[11]

The closest that plaintiff's affidavit comes to identifying a potential misunderstanding is her testimony that she does "not know what is meant by the word 'treatment'" and that she "never thought [her husband] was treated for alcoholism because he said he was going to rehab after his second DUI offense so that he did not have to go to jail for a full 45 days." [*Id.,* p.4]. In the Court's view, this paragraph comes nowhere close to establishing that plaintiff did not understand the questions on the application. Again, the previous paragraph indicates that plaintiff answered the questions read by the agent; it does not indicate that she had any difficulty understanding the questions [*see id.*]. Finally, the Court agrees with Transamerica that it is "somewhat disingenuous" for the plaintiff to suggest that she does not understand what "treatment" means but then to use the term "rehab" in the very next sentence [*see id.*].

---

[11]It is also interesting to note that plaintiff's affidavit does not state that anyone assisted her with the statements set forth therein or that anyone translated them into her native language for better comprehension. Instead, it appears that plaintiff understood fully what she was representing in her affidavit and that she has more than a "marginal knowledge of English."

None of this, of course, changes the fact that plaintiff answered the questions posed by the application form and then signed the document. If plaintiff did not understand the questions, she should not have signed the document. The law is well settled in Tennessee that by signing an insurance application and attesting to its truthfulness, an insured is generally bound to everything the application contains. *See, e.g., Beasley v. Metropolitan Life Ins. Co.*, 190 Tenn. 227, 229 S.W.2d 146, 147 (1950) (holding that an insured's beneficiary was bound by the application when "the agent read out the questions and [the insured] answered them truthfully, but that without her knowledge the agent changed the answers to the questions" and the insured "signed the false application but did not read it"). In fact, in Tennessee, even if plaintiff had not read the application at all, the fact that she signed the document would still be dispositive.

In the *Smith v. Tennessee Farmers Life Reassurance Co.* case previously discussed, the Tennessee Court of Appeals emphasized that Tennessee courts had "addressed the 'but I didn't read it' defense many times before, and the law in Tennessee on this issue has long been settled." 210 S.W.3d at 591. The Tennessee Court of Appeals then observed that "[t]he failure to read an application for insurance does not insulate an applicant from errors or omissions in a signed application" because "[a] party's signature binds him or her as a matter of law to the representations in the signed document." *Id.* (citations omitted). Consequently, in this case, plaintiff's signature on the application precludes, under Tennessee law, any potential argument that she should be relieved from the incomplete answers on the insurance application.

Likewise, the Court is not persuaded by plaintiff's argument that the involvement of Transamerica's "agent" in the completion of the application prevents application of Tenn. Code Ann. § 56-7-103. Indeed, the *Smith* opinion involves a factual scenario very similar to the present case. In *Smith*, the insured was asked questions by an "examining nurse" who "recorded his answers on a form that Mr. Smith later signed." *Id.* at 587. Nevertheless, the Tennessee Court of Appeals held that Mr. Smith's signature on that form bound him "as [a] matter of law to the representations in the signed document." *Id.* at 591. Interestingly, in a footnote, the Court observed that even if the examining nurse had incorrectly recorded Mr. Smith's answers to the questions, Tenn. Code Ann. § 56-7-103 "would still have applied as long as Mr. Smith thereafter signed the application filled out by the agent." *Id.* n.7 (citation omitted).

It naturally follows therefore that if an agent's false or incorrect statements on an application form signed by the insured do not prevent application of Tenn. Code Ann. § 56-7-103, correct - but incomplete - answers on the application do not prevent application of the statute. Because plaintiff's affidavit does not dispute the critical fact that she signed the very application that did not include medical information concerning her husband's mental health and alcoholism, the additional fact that an agent may have been involved in the completion of the form has no effect as a matter of law in Tennessee.

Finally, plaintiff suggests that because medical records were available to Transamerica, plaintiff should be excused from omitting this key medical information from the application. However, federal courts, interpreting Tennessee law, have soundly rejected

this argument. In *Metro Prop. & Cas. Ins. Co. v. Bell*, No. 04-5965, 2005 WL 1993446 (6th Cir. Aug. 17, 2005), the Sixth Circuit held that the fact that the insurance company "could have discovered [the applicant's] prior claims through a data base before granting her policy" did not "excuse [the applicant's] failure to tell the truth on her application." *Id.* at *4. Similarly, just last year, the Honorable Thomas W. Phillips held that "since the answers given in the insurance application were negative to medical problems or conditions, it is not necessary for the insurer to look further in consulting doctors." *Kees v. Celtic Ins. Co.*, No. 3:02-cv-2, 2006 WL 463121 at *6 (E.D. Tenn. Feb. 24, 2006). *See also Kelley v. Nat'l Home Life Assur. Co.*, No. 04819, 1987 WL 7725 at *5 (Tenn. Ct. App. Mar. 13, 1987) (holding that in light "of the negative answer given by [the applicant] to the question concerning refusal of a company to issue insurance," the insurance company "had no reason to make inquiry "into any potential denials of coverage in the past").

Here, because plaintiff failed to inform Transamerica regarding her husband's medical conditions and medications, Transamerica had no independent duty to investigate this matter further. No argument raised by plaintiff therefore provides a basis to prevent entry of summary judgment in favor of Transamerica on the risk of loss issue.

## B. *Non-Participating Employee Issue*

In addition to the risk of loss issue just discussed, Transamerica is entitled to summary judgment on a second independent basis. Under the plain terms of the insurance policy, plaintiff's husband was not entitled to any insurance coverage because plaintiff was a non-

participating employee. Specifically, on page 2C of the insurance policy, the policy provides that the conditional guaranteed issue limit for "Spouses of Participating Employees" is "None." [Doc. 14-3, p.21]. That page also defines participating employee as "an employee who is insured under this Term Life Insurance program and/or Transamerica Assurance Company Universal Life Insurance program policy no. 37331000." [*Id.*]. As indicated by plaintiff on the life insurance application and as set forth in her affidavit [*see* Doc. 16-2, p.4], plaintiff did not seek any insurance for herself. Instead, insurance was sought only for her husband with plaintiff as beneficiary.

Consequently, the insurance policy itself makes it abundantly evident that there is no valid coverage for plaintiff's husband in this case because the plaintiff herself had no coverage. Indeed, the record reflects that while the policy was issued to plaintiff with an effective date of June 1, 2003, Transamerica quickly became aware that a clerical error had been made. As a result, Transamerica's New Business Office cancelled the policy on May 15, 2003 [*see* Doc. 14-3, p.2]. On August 12, 2003, Transamerica returned the premiums which had been deducted from plaintiff's paycheck to her employer [*id.*]. The correspondence to Carlex, which is deemed plaintiff's agent for purposes of the life insurance policy, clearly stated that "[t]his policy was declined." [Doc. 14-3, p.28]. Even though Transamerica properly returned the premiums to Carlex, and even though Transamerica advised Carlex that the policy had been declined, Carlex mistakenly continued to deduct premiums from plaintiff's paycheck [*see* Doc. 14-3, p.2]. Once again, Transamerica returned the accrued premium payments to plaintiff's employer [*id.*]. Transamerica also indicated in

its correspondence dated December 2, 2004, that it had "received payroll deductions" from Carlex "after the policy was declined." [Doc. 14-3, p.31].

Again, the insurance policy in this case provides that plaintiff's husband was not entitled to coverage under these circumstances. As soon as this clerical error was realized, which was prior to the effective date of the policy, premium payments were returned to Carlex and Carlex was informed that the policy had been declined. Later, when Transamerica learned that Carlex had continued to deduct premiums even after the policy had been declined, Transamerica again returned the premiums to Carlex. This point must be emphasized because, under the contractual language agreed to by all parties, Carlex serves as the agent of the plaintiff for purposes of the insurance policy – Carlex does not serve as Transamerica's agent. Thus, plaintiff's agent twice received return premium payments from Transamerica and was twice informed that the policy had been declined.

Under these circumstances, by the time of Mr. Wear's death, the relevant insurance policy had been properly declined and no coverage was in place. Moreover, under the plain language of the policy, the policy affords no coverage to plaintiff because she was a non-participating employee. Either way, Transamerica is entitled to summary judgment as a matter of law on this separate basis.

**C.** *Transamerica's E-Mail of February 23, 2005 Issue*

In its memorandum and order (M&O) [Doc. 15] filed on August 9, 2007, the Court, based on its review of the entire record in this case, also requested the parties to brief the legal significance of the following e-mail:

> Arlene -
>
> Per my voicemail - Transamerica will issue the policy on Ricky Wear, BUT they must have the refund checks returned. To issue the policy, the premium must be applied to it to make it active from the original date.
>
> . . .
>
> Once the policy is issued, Fe will need to go through the normal claims processing procedures by calling Transamerica and speaking with claims directly. Mary [Wagner] will alert the claims manager regarding this situation.

[*See* Doc. 16-3, p.27]. In that M&O, the Court noted that this February 23 e-mail was sent "after Transamerica had declined to pay Ms. Wear on the policy, but after she had retained counsel to represent her in this matter and after counsel had sent correspondence to Transamerica ... ." [*See* Doc. 19, p.8]. This Court was therefore concerned that "this e-mail ... might be developed into a theory of recovery by plaintiff." [*Id.*]. However, for the reasons that follow, the Court now concludes that this e-mail has no impact whatsoever on preventing the entry of summary judgment in Transamerica's favor.

First, it must be emphasized that at the time of the filing of the M&O, the Court noted that if this case were governed by ERISA, then all of this record must be reviewed as part of an "administrative record" in an ERISA case. *See, e.g., Wilkins v. Baptist Healthcare Sys.*,

150 F.3d 609, 617-20 (6th Cir. 1998). However, because this Court has now determined that this is a diversity case and therefore governed by Tennessee law, the significance of this e-mail diminishes considerably, as does other evidence in this record, when analyzed in the context of appropriate Tennessee case law. That review now compels the inescapable conclusion that plaintiff's misrepresentations in the insurance application increased Transamerica's risk of loss as a matter of law and that coverage was properly denied because plaintiff was a non-participating employee. Consequently, this e-mail does not alter the Court's conclusion for that reason.

Second, as correctly pointed out by Transamerica, the February 23 e-mail pertains only to the issuance of the policy as opposed to payment under the policy and/or coverage. Indeed, the e-mail states that "Fe will have to go through the normal claims processing procedures by calling Transamerica and speaking with claims directly." [*See* Doc. 16-3, p.27]. Again, this e-mail indicates only that "Transamerica will issue the policy," [*see id.*], not that Transamerica will pay the policy.

Furthermore, Ms. Davis testifies that she did not execute her underwriter review form, in the context of the normal claims handling process, until June 3, 2005, more than three months after this February 23 e-mail [*see* Doc. 14-2, p.3; *see also* Doc. 14-3, pp.28-30]. By that time, Transamerica had discovered Mr. Wear's true medical condition and thus Transamerica declined to pay benefits under the policy. Hence, this e-mail has no impact on the Court's analysis and conclusion regarding Transamerica's motion for summary judgment.

**D.** *Bad Faith Penalty Issue*

Tenn. Code Ann. § 56-7-105 provides that a penalty of up to 25% can be imposed when an insurance company fails to pay an insured's loss within sixty days unless the refusal was made in good faith.  To recover a bad faith penalty, a claimant must prove that:  (1) the policy of insurance must, by its terms, have become due and payable;  (2) a formal demand for payment must have been made;  (3) the insured must have waited sixty days after making demand before filing suit (unless there was a refusal to pay prior to the expiration of the sixty days);  and (4) the refusal to pay must not have been in good faith.  *Stooksbury v. American Nat. Prop. & Cas. Co.*, 126 S.W.3d 505, 519 (Tenn. Ct. App. 2003) (citations omitted).  The burden of proving that an insurance company acted in bad faith in refusing to pay a claim whereby an insured is entitled to a bad faith penalty lies with the insured.  *Id.* (citing *Nelms v. Tenn. Farmers Mut. Ins. Co.*, 613 S.W.2d 481, 484 (Tenn. Ct. App. 1978)).

In this case, plaintiff's claim for bad faith fails because this Court has concluded, as a matter of law, that plaintiff's misrepresentations on the insurance application increased Transamerica's risk of loss and, further, because the policy at issue affords no coverage for Mr. Wear because plaintiff was a non-participating employee.  Thus, Transamerica was well within its statutory rights to refuse to pay plaintiff under this policy whereby plaintiff's claim for a bad faith penalty has no merit.

### VI. *Conclusion*

For the reasons foregoing, Transamerica's motion for summary judgment [Doc. 14] will be granted whereby summary judgment will be entered in Transamerica's favor and this case dismissed against it. Transamerica's motion to dismiss [Doc. 18] will be denied as moot.

The Court will enter an appropriate judgment.


s/ Thomas A. Varlan_____
UNITED STATES DISTRICT JUDGE